# EXHIBIT E

Cause No. 2022-22547

| | | |
|---|---|---|
| Stemmons Enterprise, L.L.C., | § | In the District Court of |
| f/k/a Boxer Enterprise, L.L.C., | § | |
| *Plaintiff* | § | |
| | § | Harris County, Texas |
| v. | § | |
| | § | |
| Fisker Inc., | § | |
| *Defendant.* | § | 11TH Judicial District |

## Plaintiff's First Amended Original Petition

### I.    Discovery Control Plan

1.    Plaintiff requests that discovery be conducted under a Level 3 discovery control plan. *See* Tex. R. Civ. P. 190.4.

### II.    Parties

2.    Plaintiff Stemmons Enterprise, L.L.C., f/k/a Boxer Enterprise, L.L.C. (Stemmons) is a Texas limited liability company with its principal place of business in Houston, Texas.

3.    Defendant Fisker Inc. (Fisker) is a Delaware corporation with its principal place of business in Manhattan Beach, California. In Section 11(c) of the License Agreement dated December 6, 2016, that governs this dispute (Ex. A), Fisker "consent[ed] to service of process by certified mail, return receipt requested, or by established overnight courier with proof of delivery or refusal (e.g., FedEx or UPS)." Service on Fisker in that manner may be

made on Fisker's registered agent, National Registered Agents, Inc. at 1209 Orange St., Wilmington, DE 19904.

### III. Jurisdiction & Venue

4.      This Court has subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits of this Court. *See* Tex. Gov't Code §§ 24.007 & 24.008. Stemmons seeks non-monetary relief and monetary relief. *See* Tex. R. Civ. P. 47(c).

5.      The Court has personal jurisdiction over Fisker pursuant to the Parties' License Agreement. This suit arises out of or relates to the Licensing Agreement or a transaction or relationship resulting from it. For such claims, the parties agreed that the courts in Houston, Harris County, Texas with subject matter jurisdiction have exclusive jurisdiction. (Ex. A. at § 11(c)). The parties also specifically consented to personal jurisdiction in this Court and agreed not to contest same. The Court therefore has personal jurisdiction over Fisker. *Guam Indus. Services, Inc. v. Dresser-Rand Co.*, 514 S.W.3d 828, 833 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (quoting *In re Fisher*, 433 S.W.3d 523, 532 (Tex. 2014)) ("contractual 'consent-to-jurisdiction clause' subjects a party to personal jurisdiction, making an analysis of that party's contacts with the forum for personal jurisdiction purposes unnecessary.")

Certified Document Number: 101785478 - Page 2 of 16

Certified Document Number: 101785478 - Page 3 of 16

6. Venue is proper under Section 11(c) of the License Agreement which, in addition to providing that this Court has exclusive jurisdiction over the matter, states that the parties agree "not to assert any claim of inconvenient venue." (Ex. A). Venue is also proper in Harris County, Texas either because it is the county in which all or a substantial part of the events or omissions giving rise to Stemmons's claims occurred, or because it is where Stemmons resided at the time of the accrual of its causes of action. *See* Tex. Civ. Prac. & Rem. Code § 15.002.

## IV.   Background

### A.   Investment in Fisker in Exchange for Use and Promotion of Stemmons Software

7. Stemmons is a software company that provides and supports a suite of programs customers may configure "to create any business process, regardless of industry or department." https://stemmons.com/how-it-works/. Andrew Segal is a principal of Stemmons and an entrepreneur who has successfully founded and operated real estate, software, and other businesses.

8. Fisker was co-founded in 2016 by Mr. Henrik Fisker and Dr. Geeta Guptz-Fisker. Henrik Fisker is an award-winning automotive designer known for his luxury sports car designs and his involvement in

electric vehicle battery design. He presently serves as Fisker's Chairman of the Board, President, and Chief Executive Officer.

9.     Dr. Fisker started her career as an academic at the University of Cambridge, UK, earning a PHD in Biotechnology in 2001 and post-doctoral Fellowship at Cambridge in 2004. She has over 20 years of experience in technology and finance. Prior to co-founding Fisker with her husband, Dr. Fisker managed the Fisker family's business and investments, served as an investment advisor at the Alfred Mann Foundation, held investment roles at a multibillion family office in London, and worked at Lloyds Banking Group, where she learned the foundations of debt and equity. Dr. Fisker is Fisker's Chief Financial Officer and Chief Operating Officer.

10.     Fisker was organized to design, manufacture, and sell electronic vehicles and to be the world's first "digital car company" through its direct-to-consumer operating model (like Teslas) and app interface for customer sales, leasing, maintenance, and other innovative features.

11.     In 2016, the Fiskers approached Segal about becoming an early investor. Segal believed investing would allow Stemmons to license its software for Fisker's all-digital operations and expand into the automotive industry. The parties therefore decided to establish a business relationship whereby Segal invested $500,000 in Fisker in exchange for Fisker's

Certified Document Number: 10178478 - Page 4 of 16

agreement to license and use Stemmons Software throughout the company and promote it to other businesses in the industry and refer those businesses to Stemmons as potential clients for the Stemmons Software.

12.    The parties negotiated and ultimately executed three related agreements on December 6, 2016: (1) a Share Purchase Agreement under which Segal invested in Fisker, (2) a long-term Software License Agreement (Ex. A) by which Fisker licensed Stemmons Software for use throughout the company, and (3) a Referral Agreement by which Fisker would earn fees by referring to Stemmons potential licensees (Ex. B).

## B.    The License Agreement

13.    The parties expected Fisker employees to use the Stemmons Software throughout all departments and divisions of the company as the single interface to access all company information and systems. It would perform functions such as specific-use configured applications to handle a broad range of business processes, data aggregation and normalization, document management, and integration of external systems. Across the company, the Stemmons Software would handle basic functions like onboarding, quality assurance, task management, and asset tracking. In the License Agreement, Fisker therefore agreed to "use the Licensed Programs throughout its business, and all divisions, subsidiaries, and affiliates,

Certified Document Number: 101785478 - Page 5 of 16

Certified Document Number: 10178478 - Page 6 of 16

**to achieve the widest possible use.**" (Ex. A, Schedule A at ¶ 2) (emphasis added).

14. Fisker had few employees at its inception, but the parties expected it to grow substantially once it became established and began selling cars. As Fisker grew, so would its use of the Stemmons Software. As the number of Fisker employees using the Stemmons Software grew, the license fees Fisker paid Stemmons would increase. Those expectations are reflected in the terms of the License Agreement.

15. The Software License Agreement governs Fisker's use of the "Stemmons Technology," defined to mean (1) Stemmons Software, whether browser-based or installed on Fisker's computers, and (2) certain on-line services provided by Stemmons. (Ex. A at § 1) Fisker is licensed to use the Stemmons Software and to access the services so long as it pays an annual license fee for the "designated users or license units (for example, users, workstations, servers, etc.)." (Ex. A at § 2(a)).

16. The License Agreement required Fisker to pay an annual license fee for every employee with access to the software but set a low minimum number of users because initially, Fisker had few employees and cash concerns. For example, Fisker negotiated with Stemmons to reduce the

minimum number of designated users from 50 to just 10 (totaling only $3,000 per year).

17.     Instead of setting the maximum number of employees licensed to use the software, the parties (1) agreed Fisker would use the Stemmons Software "throughout its business . . . to achieve the widest possible use," (2) defined designated user broadly to include every employee and contractor with access to the Stemmons Software through Fisker's computer system, (3) provided that users added during the license term would be charged a pro-rated annual fee, and (4) allowed Stemmons the right to audit Fisker's use of the software. (Ex. A, Schedule A at ¶¶ 2, 14).

18.     The License Agreement also incentivized Fisker's use (and promotion) of the software while protecting Segal's $500,000 investment in two ways. First, it provides that the amount of the annual license fee will be reduced 50% once Fisker pays Stemmons $500,000 in cumulative fees. (Ex. A, Schedule A at ¶ 4). Second, it has a 10-year, non-cancellable initial term that automatically renews annually thereafter until Stemmons receives $500,000 in licensing fees plus fees from referrals under the Referral Agreement. (Ex. A, Schedule C).

Certified Document Number: 101785478 - Page 7 of 16

Certified Document Number: 101785478 - Page 8 of 16

## C. Payment of Minimum Fees as Fisker Gets Started

19.     Fisker remained a small company in its early years as it focused on developing its first vehicle, the Emotion. In August 2017, the parties began discussing how to implement the Stemmons Software on a broad basis. Fisker was exploring franchise opportunities and wanted to expedite training and integration of the Stemmons Software with Fisker's EV Hybrid Shop. Fisker explained it intended to use the software for, among other things, technical support, product warranty administration, ordering, and franchise administration.

20.     Stemmons explained its proposed implementation process would begin with some basic functionality then add the requested items as they were defined and prioritized. Stemmons also discussed how the software would be configured to create systems for customer relationship management and maintenance service ticketing. And it would leverage Fisker's existing accounting software to create a parts and order management process.

21.     Although Fisker unveiled the EMotion in January 2018 during the Consumer Electronics Show in Las Vegas, it soon changed directions. In September 2018, Fisker announced its plan to design and produce an all-electric SUV, the Ocean, in place of the EMotion. At Fisker's request in May

Certified Document Number: 101785478 - Page 9 of 16

of 2019—29 months after the License Agreement was signed—the parties signed a new confidentiality agreement governing disclosure of Stemmons's and Fisker's confidential and proprietary information related to "software configuration and implementation." (Ex. H, Confidentiality Agreement)

22.     Fisker also paid outstanding license fees for 2017, 2018, and 2019 at the 10-user minimum.

## D.     Fisker Refuses to Increase License Fees as Its Growth Explodes

23.     Stemmons invoiced Fisker in December 2019 for the 10-user minimum, but Fisker did not pay the invoice until mid-2020. Meanwhile, Fisker had finally begun to grow as it made progress with the Ocean. It unveiled a prototype in January 2020 and announced that deliveries were anticipated to begin in 2022. It also continued to raise capital. In July, it (1) completed a $50 million Series C financing round, (2) disclosed it would make a public offering on the NYSE through a merger with a special purpose acquisition company, and (3) announced plans for a four-vehicle portfolio by 2025.

24.     Stemmons learned that by October 2020 Fisker had grown to 81 employees; by year-end, it had grown to 101. In 2020 therefore, Stemmons invoiced Fisker for 100 licenses for the following year, 2021. For 10 months, Fisker did not object to the increase.

Certified Document Number: 101785478 - Page 10 of 16

25.    Around the same time Stemmons sent the invoice for 100 licenses, the parties again discussed Fisker's broad implementation of the Stemmons Software. They developed a plan for the "[r]apid expansion to source, open, and operate a series of "Experience Centers" around the world, which is where potential customers would view Fisker's vehicles. A December 2020 presentation contemplated approximately 50 licenses "scaling through next year" and that Fisker would "conduct a follow on deep dive for exact number over next 12mo." Fisker made modifications to this presentation but not to these objectives. In mid-January of 2021, however, Fisker said the experience centers were being delayed by COVID, and Stemmons acknowledged "the need for flexibility and moving targets" under the circumstances.

26.    In June 2021, Fisker announced it had signed a manufacturing agreement for the Ocean, with production expected to start in November 2022. But it had still not paid Stemmons's 2021 invoice for 100 license fees.

27.    In August, Stemmons inquired about payment. In October, Fisker objected for the first time to paying for 100 licenses, saying it was not using the Stemmons Software and claiming the License Agreement did not obligate Fisker to use the software or pay for more than 10 licenses.

Certified Document Number: 101785478 - Page 11 of 16

Stemmons then learned that, a year earlier, Fisker had licensed a different software from a different vendor.

28.     Stemmons formally demanded payment of its 2021 invoice on September 24, 2021, which Fisker refused to pay.

29.     Meanwhile, Fisker continues to grow. By November 2021, Fisker had over 300 full-time employees and boasted publicly of its "brisk" recruitment. Stemmons therefore invoiced Fisker for 300 licenses for 2022.

30.     Fisker has never claimed that only 10 or fewer of its current employees and contractors use its computer systems. It is not making the widest possible use of the Stemmons Software; it is making no use of it at all. And Fisker has still not paid any portion of the 2021 or 2022 invoices, even for the 10-user minimum.

## V.     Causes of Action

### A.     Declaratory Judgment

31.     Stemmons incorporates the preceding paragraphs here by reference.

32.     Stemmons requests a declaratory judgment that the plain and unambiguous meaning of the License Agreement requires Fisker to use the Stemmons Software in its computer systems throughout its business in every way possible and to designate as users and pay a license fee for all employees and contractors who use Fisker's computer systems in their work for Fisker.

33. Alternatively, paragraph 2 of Schedule A to the License Agreement is ambiguous, and extrinsic evidence of the parties' intent is therefore admissible. Upon resolution of that fact issue, Stemmons requests a declaratory judgment that the License Agreement requires Fisker to use the Stemmons Software in its computer systems throughout its business in every way possible and to designate as users and pay a license fee for all employees and contractors who use Fisker's computer systems in their work for Fisker.

**B.    Breach of Contract**

34.    Stemmons incorporates the preceding paragraphs here by reference.

35.    The plain and unambiguous meaning of the License Agreement requires Fisker to use the Stemmons Software in its computer systems throughout its business in every way possible and to designate as users and pay a license fee for all employees and contractors who use Fisker's computer systems in their work for Fisker.

36.    Alternatively, paragraph 2 of Schedule A to the License Agreement is ambiguous. Extrinsic evidence of the parties' intent is therefore admissible and will show the parties intended for Fisker to use the Stemmons Software in its computer systems throughout its business in every way

Certified Document Number: 101785478 - Page 12 of 16

Certified Document Number: 101785478 - Page 13 of 16

possible and to pay a license fee for all employees and contractors who access Fisker's computer systems in their work for Fisker.

37.    Fisker has breached the License Agreement by failing to make the widest possible use of the Stemmons Software in Fisker's business.

38.    Fisker has breached the License Agreement by refusing to pay the 2021 invoice, including for the undisputed amounts owed for the 10-user minimum.

39.    Fisker has breached the License Agreement by refusing to pay the 2022 invoice, including for the undisputed amounts owed for the 10-user minimum.

## VI.    Attorneys' Fees

40.    Stemmons is entitled to recover its reasonable and necessary costs and attorneys' fees incurred in connection with this litigation pursuant to Section 37.009 and Chapter 38 of the Texas Civil Practice and Remedies Code, as well as any other basis for the recovery of such costs and fees under applicable law.

## VII.  Conditions Precedent

41.    All conditions precedent to recovery, to the extent they exist, have been performed or have occurred. *See* Tex. R. Civ. P. 54.

## VIII. Jury Demand

42.     Plaintiff demands a trial by jury and tenders the appropriate fee with this petition.

## IX.   Prayer

43.     Plaintiff prays that citation be issued and served upon Defendant. Plaintiff further prays that the Court enter judgment:

(a)     Declaring that the License Agreement requires Fisker to use the Stemmons Software in its computer systems throughout its business in every way possible and to designate as users and pay a license fee for all employees and contractors who use Fisker's computer systems in their work for Fisker;

(b)     Awarding Stemmons actual damages for Fisker's breach of the License Agreement;

(c)     Awarding Stemmons its reasonable and necessary costs and attorneys' fees pursuant to any applicable law or contractual provision; and

(d)     Awarding Stemmons any other relief to which it is entitled.

Certified Document Number: 10178547 8 - Page 14 of 16

Respectfully submitted,

 /s/ Paul W. Smith
Paul W. Smith
Texas Bar No. 18662700
Eileen O'Neill
Texas Bar No. 15114400
Michelle R. Meriam Blair
Texas Bar No. 24063871
Ware, Jackson, Lee, O'Neill,
    Smith & Barrow, LLP
2929 Allen Parkway, 39th Floor
Houston, Texas 77019
(713) 659-6400
(713) 659-6262 (fax)
paulsmith@warejackson.com
eileenoneill@warejackson.com
michellemeriam@warejackson.com

**Attorneys for Plaintiff,
Stemmons Enterprise**

Certified Document Number: 101785478 - Page 15 of 16

# Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Paul Smith on behalf of Paul Smith
Bar No. 18662700
paulsmith@warejackson.com
Envelope ID: 64207063
Status as of 5/5/2022 1:39 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Paul W.Smith | | paulsmith@warejackson.com | 5/5/2022 8:38:22 AM | SENT |
| Eileen F. O'Neill | | eileenoneill@warejackson.com | 5/5/2022 8:38:22 AM | SENT |
| Michelle B.Meriam | | michellemeriam@warejackson.com | 5/5/2022 8:38:22 AM | SENT |

Certified Document Number: 101785478 - Page 16 of 16



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 6, 2022

Certified Document Number:        101785478 Total Pages:  16

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# EXHIBIT A

Certified Document Number: 101785480 - Page 1 of 26

STEMMONS ENTERPRISE

**SOFTWARE LICENSE AGREEMENT FOR STEMMONS ENTERPRISE**

The parties below agree to the terms and conditions following their signatures, effective as of the last date signed as written below.

| AGREED: | AGREED: |
|---|---|
| Fisker Inc., a Delaware corporation ("**Licensee**"), **by:** | Boxer Enterprise, L.L.C., a Texas limited liability company, d/b/a Stemmons Enterprise ("**Stemmons**"), by: |

*Henrik Fisker*
748701AC448C44C...

Signature

Henrik Fisker
Printed name

CEO
Title

12/6/2016
Date signed

**Licensee's initial address for notice:**
1875 Century Park East, Suite 370
Los Angeles, CA 90067

*Andrew Segal*
...553B4FA...

Signature

Andrew Segal
Printed name

ceo
Title

12/6/2016
Date signed

**Stemmons' initial address for notice:**
Attention: General Counsel
720 North Post Oak Blvd, Suite 500
Houston TX 77024,

## 1. Background

a) This Software License Agreement ("**Agreement**") governs Licensee's use of the "**Stemmons Technology**," namely the following, as specified in Schedule A attached hereto and incorporated herein:

   1) certain Software, either browser-based or as installed in executable form on one or more Licensee machines as identified in Schedule A and related documentation (which Stemmons may provide in electronic format) (the "**Software**"); and

   2) certain on-line services provided by Stemmons, accessible via Software (the "**Service**").

b) For the avoidance of doubt, this Agreement applies to all versions of the Stemmons Technology, including for example:

   1) to any updates, patches, new releases, supplements and/or add-on components to the Software that Stemmons may (in its sole discretion unless otherwise agreed in writing) provide or make available to Licensee; and

**EXHIBIT A**

DocuSign Envelope ID: ABBA6B44-BC5E-417A-A848-7875CAB3362E

2) to any additional licenses for Stemmons Technology that may be purchased by Licensee.

3) **SPECIAL NOTE – SALES VIA RESELLER:** This Section 1(c) addresses the situation in which Licensee acquired its license for a given item of Stemmons Technology from a reseller or other intermediary authorized by Stemmons (referred to for convenience simply as **"Reseller"**), and not directly from Stemmons.

    1) In that case, **all obligations in this Agreement concerning warranties and maintenance that are described as obligations of Stemmons are instead the obligations of Reseller and not of Stemmons.**

    2) For the avoidance of doubt, all disclaimers of warranties, remedies, etc., and all limitations of liability, that are set forth in this Agreement will benefit Reseller to the same extent as it does Stemmons.

## 2. License Grant; Authorized Use

a) Licensee is licensed to use one or more specific items of the Software, and to access the Service, so long as the Annual License Fee is paid (as specified in Schedule A):

    1) during the specified **License Term**; and

    2) for the specified number of designated users or license units (for example, users, workstations, servers, etc.) as specified in Schedule A;

each as set forth in Schedule A as accepted by Stemmons.

b) Any version of the Software installed on one or more Licensee machines (as opposed to browser-based versions) are licensed in executable form only.

c) Any supplemental third-party software that Licensee uses in conjunction with the Stemmons Technology, whether provided by Stemmons or otherwise, may only be so used so long as Licensee's use of the supplemental software complies with applicable third-party software licensing terms and conditions, if any

d) The Software is licensed, not sold. Stemmons or its supplier(s), as applicable, retain title and all ownership rights, of whatever nature, to the Stemmons Technology and to the tangible

Certified Document Number: 101785480 - Page 2 of 26

copy or copies of the Software. All rights not expressly granted herein are reserved by and to Stemmons or its suppliers, as applicable.

e) Unless otherwise agreed in writing:

1) all licenses for the Stemmons Technology are non-exclusive;

2) purchased licenses are valid only during the License Term; and

3) evaluation licenses are valid only for a limited time and/or usage.

f) Licensee may not work around any mechanism that may be built into the Stemmons Technology (including for example into software installation routines) to enforce time- or usage limitations.

g) Licensee may use the Stemmons Technology in accordance with this Agreement solely for Licensee's internal business use, specifically excluding service-bureau use or use as an outsourcer or other third party use.

h) Licensee may not use the Stemmons Technology except in accordance with this Agreement, nor permit or assist others to do so.

i) *(Applicable to installed versions only)* Licensee may make a reasonable number of copies of installed-version Software for backup purposes.

j) *(Applicable to installed versions only)* Licensee may make use of licensed Software for reasonable disaster-recovery testing and disaster-recovery operations.

k) Except for assignments permitted hereunder, Licensee may not rent, lease, sell, sublicense, assign, or otherwise transfer any Software or license, including the documentation, which remain the confidential property of Stemmons or its suppliers.

l) Licensee may not disclose any Stemmons Technology to third parties except as permitted by this Agreement or with Stemmons' prior written consent.

m) Licensee will use reasonable efforts, which are no less than the efforts Licensee uses to safeguard Licensee's own confidential information, to safeguard the Stemmons Technology.

**EXHIBIT A**

DocuSign Envelope ID: ABBA6B44-BC5E-417A-A848-7875CAB3362E

n) Licensee may not decompile, disassemble, or reverse engineer any Stemmons Technology or any part of it, nor permit or assist others to do so. If applicable law permits Licensee to engage in such activities notwithstanding this Agreement, Licensee will provide Stemmons with advance notice and reasonably detailed information concerning Licensee's intended activities.

o) The license includes a background-rights license under any patent, copyright, trade secret, or trademark right of Stemmons to the extent (and only the extent) necessary for Licensee's licensed use of the Stemmons Technology.

p) *(Applicable to installed versions only)* Upon Stemmons' request with at least 10 days' notice, Licensee will provide Stemmons with information about Licensee's installation and usage of Software sufficient to confirm compliance with this Agreement. Stemmons may audit such information upon reasonable notice to Licensee. Stemmons will not disclose or use any information revealed in such audit except to ensure Licensee's compliance, and to invoice for additional Designated Users, as applicable, under Schedule A.

## 3. Updates; Support

a) Except as otherwise provided in this Agreement:  During the License Term, Stemmons will provide Licensee with support for the licensed item(s) of Stemmons Technology in accordance with Schedule A.

b) During the License Term, Stemmons will not reduce support below the following level:

1) product updates for relevant items of Software as released by Stemmons in its sole discretion;

2) Stemmons will provide application support for the Software as defined below, so long as Licensee appoints an application support point of contact.  Stemmons shall have no obligation to communicate with anyone regarding support and maintenance issues except Licensee's application support point of contact, and it is Licensee's responsibility to keep is application support point of contact current, and to notify Stemmons of any changes.  Stemmons' application support shall consist of response to on-line cases submitted by Licensee's application support point of contact through Stemmons' CME portal for licensed users and usability problems, and patches for bugs and security

holes in the Software, for instances in which the, to troubleshoot and resolve software conflicts  Software is being used as and in the environment intended; and

3)  if Stemmons determines that a reported reproducible material error exists in an item of Stemmons Technology exists that significantly impairs the usability and utility of that item when the Technology is being used as and in the environment intended, then Stemmons will make reasonable efforts (A) to provide a usable work-around solution and/or (B) to correct the issue in an upcoming maintenance release or update (made available at Stemmons' sole discretion). This support is in addition to any remedies Licensee may have under the warranty provisions of this Agreement.

c)  Stemmons will have the right to adopt, adapt, and/or use any ideas or suggestions that Licensee makes or gives Stemmons relating to the Stemmons Technology, permanently and throughout the world, without compensation to Licensee.  Stemmons will establish an online user community and forum, in which Stemmons will participate or moderate at its discretion, and may refer questions and requests for support to the forum as applicable.

d)  Stemmons need not provide support if Licensee is (1) delinquent on any invoice payment due to Stemmons, or (2) otherwise in breach of this Agreement.

e)  For the avoidance of doubt, unless the parties mutually agree otherwise (each in its sole discretion), on a case-by-case basis, Stemmons need not send personnel to Licensee's site, nor need Stemmons provide support for issues apparently arising from:

1)  Licensee's negligence or other fault, training issues or support, data issues, or "how to" help desk type requests or items;

2)  hardware malfunction;

3)  use of Software in an environment, or with other software, not supported by Stemmons; or

4)  *(Applicable to installed versions only)* Licensee's failure to keep its installed version of the Software (if any) current with the latest versions, updates, patches, etc.

**EXHIBIT A**

DocuSign Envelope ID: ABBA6B44-BC5E-417A-A848-7875CAB3362E

## 4. Information Content; Security

a) Stemmons will not claim ownership of any information that Licensee processes, transmits, or stores using the Stemmons Technology.

b) All content and other intellectual property made available to Licensee by Stemmons (other than Licensee's own) is the property of Stemmons or its providers; Licensee may not claim ownership of any of it.

c) As between Licensee and Stemmons, Licensee is solely responsible for the content of any information that Licensee may process, transmit, or store using the Stemmons Technology. Licensee will defend and indemnify Stemmons; its affiliates; and the officers, directors, and employees of each of them; from any third-party claim or for damage to the Stemmons Technology of any nature concerning such content.

d) As between Licensee and any individual who accesses the Stemmons Technology via a Licensee account, all Licensee information is owned by Licensee and not by that individual.

e) Stemmons may in its discretion remove or block access to any content that Licensee processes, transmits, or stores using the Stemmons Technology in violation of the prohibited-content provisions of this Agreement. (Stemmons does not undertake to police Licensee's content, though.)

f) Stemmons will endeavor to keep the help features of its Web site up to date with respect to specific features of the Stemmons Technology, but License acknowledges that the information might not always be up to date.

g) Licensee agrees that Stemmons may collect, store, use, compile, modify, translate, and/or disclose information that Licensee processes, transmits, or stores using the Technology as stated in the Stemmons privacy policy or as required by law, for the purpose of developing, servicing or maintaining the Technology and to monitor the use of the Technology.

h) IF: Stemmons receives a subpoena, search warrant, or other official request for information Licensee has provided; THEN: Stemmons will:

1) endeavor to promptly report the demand to Licensee, subject to any applicable legal restrictions on such reporting; and

**EXHIBIT A**

DocuSign Envelope ID: ABBA6B44-BC5E-417A-848-7875CAB3362E

2) provide reasonable cooperation with any efforts Licensee might make, at Licensee's request and expense, to limit the disclosure and/or to obtain legal protection for the information to be disclosed.

i) Licensee agrees to notify Stemmons promptly if Licensee suspects that someone else has obtained access to a Licensee user's login ID or password, or that a breach of security for any aspect of the Stemmons Technology has occurred, is about to occur, or is being planned.

j) Except as stated in this Agreement or in the Stemmons privacy policy, it is Licensee's responsibility, not Stemmons', to protect Licensee's password and any legal rights Licensee may have in information that Licensee provides to the Stemmons Technology.

k) Stemmons will make reasonable efforts to help Licensee to reset a lost password, but Stemmons is not responsible for any harm that Licensee might suffer if Stemmons is unable to do so and as a result Licensee cannot access its stored information.

l) Stemmons reserves the right to suspend an individual Licensee user's access to a Licensee business account if requested by an officer or comparable official of Licensee.

m) Licensee's service plan may allow Licensee to register a subdomain of a Stemmons URL to point to Licensee's data repository, for example, "LICENSEE-NAME.[STEMMONSor GENERIC NAME].com". Stemmons reserves the right, in its sole discretion, on 30 days' written notice, to require Licensee to change any such subdomain to an alternative acceptable to Stemmons; if Licensee does not do so, then Stemmons may disable the subdomain.

n) If Licensee uses the local-storage option of the Stemmons Technology, Licensee should be sure to make regular backups of the data that it stores locally. In addition to the warranty disclaimer and limitations of liability of this Agreement, Stemmons WILL NOT BE LIABLE for any harm arising from damage to Licensee's locally-stored data, even if caused by the Stemmons Technology (e.g., by a software error in the server(s) providing the Service or in Software such as a browser plug-in), to the extent that the harm could have been prevented or mitigated by prudent precautions such as, for example, regular backups.

o) Notwithstanding anything to the contrary herein, Licensee agrees that Licensor shall be given access to, and have the right to use, adopt, copy, sell and license and non-proprietary

**EXHIBIT A**

aspects of Licensee's configuration or use of the Stemmons Technology, including but not limited to items such as case types, task types, entity types, standards, quest forms, and similar configurations created or utilized by Licensee.

## 5. Use Restrictions

a) Wherever this Agreement prohibits or restricts Licensee from doing something, Licensee is also prohibited or restricted from attempting to do it and from inducing, soliciting, permitting, or knowingly assisting anyone else to do so, whether for Licensee's benefit or otherwise.

b) Licensee may not resell access to the Stemmons Technology to anyone else except to the extent, if any, permitted by the applicable service plan.

c) Licensee may not knowingly let anyone access or use the Stemmons Technology except authorized Licensee users.

d) Licensee may not disassemble, decompile, or otherwise reverse-engineer the Stemmons Technology or the software used to provide it.

e) Licensee may not make or distribute copies of, or create derivative works based on, any content provided via the Stemmons Technology, other than Licensee's own content or as expressly authorized in writing by Stemmons or other owner of the content.

f) Without limiting Licensee's other obligations under this Agreement, Licensee may not use the Stemmons Technology in an unreasonable manner. For purposes of illustration, an agreed, non-exhaustive list of actions that are conclusively deemed to be unreasonable is set forth below:

1) interfering with others' use of the Stemmons Technology.

2) accessing anyone else's information stored on the Stemmons Technology without proper authorization.

3) using someone else's user name and password to access the Stemmons Technology.

4) probing or attempting to breach the security measures of the Stemmons Technology or any network associated with it.

**EXHIBIT A**

DocuSign Envelope ID: ABBA6B44-BC5E-417A-848-7875CAB3362E

5) seeking to trace any information about, or owned by, any other user of the Stemmons Technology, including but not limited to personal identifying information and financial information.

6) taking any action that unreasonably burdens the Stemmons Technology, any network associated with it, or any other network associated with Stemmons. This may include, for example (but not as a limitation), bandwidth usage that Stemmons judges to be excessive.

7) engaging in "spoofing," for example, disguising the origin of any transmission Licensee sends to Stemmons via the Stemmons Technology or any network associated with it.

8) using a bot, screen scraper, Web crawler, or any other method to access the Stemmons Technology or any content stored at the Stemmons Technology, other than the user interface provided by Stemmons.

9) impersonating anyone in connection with the Stemmons Technology.

10) pretending to represent another individual or entity in connection with the Stemmons Technology.

11) infringing someone's copyright, trademark, trade secret, or other intellectual property right in connection with Licensee's use of the Stemmons Technology.

12) exporting or re-exporting goods or technical data in violation of law.

13) using the Stemmons Technology to transmit or store any of the following:

   A) viruses, Trojan horses, bots, crawlers, keystroke recorders, or other malware of any kind;

   B) information owned by someone else without their permission;

   C) information used or intended to be used in any unlawful manner, in connection with any unlawful purpose, or in any manner that could expose Stemmons to a risk of liability;

   D) information that violates any other acceptable-usage policy that Stemmons may publish from time to time (Stemmons will give Licensee notice if it does so).

**EXHIBIT A**

## 6.  Limited Warranties; Exclusive Remedies

a) APPLICABILITY: The warranties of this Section 6:

1) apply during the License Term except as otherwise indicated; and

2) are subject to the limitations of remedies below.

b) *[Applicable to installed versions only]* MEDIA WARRANTY. Stemmons warrants to Licensee, for 60 days after delivery, that any media that Stemmons provides on which the Software is delivered (if any) will be free from defects. LICENSEE'S EXCLUSIVE REMEDY for any breach of such warranty will be for Stemmons to replace the defective media without charge.

c) NONINFRINGEMENT WARRANTY. Stemmons warrants to Licensee that neither the Stemmons Technology nor its use in accordance with the Stemmons-provided accompanying documentation, in and of themselves, infringes any valid copyright or trade secret right, nor so far as Stemmons knows any patent right or other intellectual-property right, of any third party.

1) For the avoidance of doubt, the warranty of this Section 6(c) applies solely to the Stemmons Technology as delivered and not, for example, as modified by any individual or entity other than Stemmons (this sentence, however, is not to be deemed to imply that any other individual or entity has the right to modify any aspect of the Stemmons Technology).

2) LICENSEE'S EXCLUSIVE REMEDY for any breach of the warranty of this Section 6(c) will be to invoke the provisions of the "Infringement Indemnity" section of this Agreement.

d) PERFORMANCE WARRANTY.

1) Stemmons warrants to Licensee that, during the License Term (referred to here as the "**Performance-Warranty Period**"), all Stemmons Technology licensed under a purchased license, when used in accordance with the user documentation furnished by Stemmons, will perform, in all material respects, substantially in accordance with such documentation.

**EXHIBIT A**

Certified Document Number: 101785480 - Page 10 of 26

DocuSign Envelope ID: ABBA6B44-BC5E-417A-A848-7875CAB3362E

2) IF: During the Performance Warranty Period, Licensee gives Stemmons notice of a failure by an item of Stemmons Technology to comply with the Performance Warranty; THEN: Stemmons will do one or more of the following, with the choice(s) being in Stemmons' sole discretion:

A) provide Licensee with a correction or workaround for such failure within a reasonable period of time, not to exceed 30 business days without Licensee's approval (the "**Fix Period**"), or

B) if for a reason solely in its control, Stemmons does not provide a work around as provided in subdivision (A), then upon Licensee's written request Stemmons will refund the Annual License Fee(s) paid for the failed item(s) of Stemmons Technology for the then-current License Term, prorated as of the date of Licensee's failure notice to Stemmons.

3) Licensee must provide Stemmons with such information about the failure as Stemmons reasonably requests.

4) Licensee must make any refund request by notice to Stemmons no later than the end of the Performance Warranty Period or 10 business days after the end of the Fix Period, whichever is later.

5) Stemmons' obligations under this Section 6(e) are **LICENSEE'S EXCLUSIVE REMEDIES** for any breach of the Performance Warranty.

## 7. Infringement Indemnity

a) IF: A third party (other than Licensee's affiliate) makes a claim that, if successful, would constitute a breach of the noninfringement warranty of section 6(c); THEN: Stemmons will:

1) defend Licensee against the claim, at Stemmons' expense; and

2) indemnify Licensee against any resulting monetary awards by the court, subject to the conditions stated in this Section 7.

b) For Licensee to be entitled to defense and indemnity under subdivision (a), Licensee must:

1) promptly notify Stemmons in writing of the third-party claim;

Certified Document Number: 101785480 - Page 11 of 26

2) not make any non-factual admissions in respect of the claim without Stemmons' prior written consent;

3) give Stemmons sole control of the defense;

4) not settle the claim without Stemmons' consent; and

5) assist Stemmons in the defense at Stemmons' request and expense.

c) Stemmons' **MAXIMUM AGGREGATE LIABILITY** for defense and indemnity under subdivision (a) will be the aggregate amount of the applicable License Fees paid pursuant to this Agreement by Licensee in respect of the Software in question.

d) At Licensee's option, Licensee may engage separate counsel, at Licensee's own non-reimbursable expense, to monitor the defense; if Licensee advises Stemmons that Licensee has done so, Stemmons will instruct Stemmons' counsel to provide all reasonable cooperation with Licensee's counsel for that purpose.

e) IF: (i) Stemmons so defends Licensee, but a court of competent jurisdiction nevertheless orders Licensee to stop using one or more aspects of the Stemmons Technology as a result of the claim, and Stemmons is unable to have the order stayed or overturned on appeal, or (ii) Stemmons settles the claim on terms that require Licensee to cease using one or more aspects of the Stemmons Technology, or (iii) Stemmons reasonably determines that Licensee should stop using the Stemmons Technology; THEN: Stemmons will, at Stemmons' option and expense:

1) replace or modify the relevant aspect(s) of the Stemmons Technology to make it non-infringing while still performing the same or substantially the same functions; or

2) procure the right for Licensee to continue using the relevant aspects of the Stemmons Technology; or

3) if in Stemmons' judgment neither of the courses of action described in subdivisions (e)(1) and (e)(2) is commercially feasible, then Stemmons may in its discretion:

A) advise Licensee to stop using the relevant aspect(s) of the Stemmons Technology; and

**EXHIBIT A**

DocuSign Envelope ID: ABBA6B44-BC5E-417A-A848-7875CAB3362E

B) refund the unused portion of the Annual License Fee that Licensee paid for the then-current License Term, computed pro-rata on a monthly basis as of the date Stemmons directed Licensee to stop using the relevant aspect(s) of the Stemmons Technology.

f) Stemmons will not be responsible for any infringing use that Licensee may make of the Stemmons Technology after Stemmons advises Licensee to stop using the Stemmons Technology under subdivision (e).

g) Stemmons' obligations under this Infringement Indemnity section are **LICENSEE'S EXCLUSIVE REMEDIES** for any alleged or actual infringement by the Stemmons Technology or Licensee's use of any aspect of the Stemmons Technology.

h) One or more items of Software may include third-party software code that is licensed, or sublicensed, to the user under the GNU General Public License (GPL) or other similar software licenses, which may provide for certain rights to Licensee relating specifically to such code. If any such code exists in such an item, Stemmons will, upon written request made by Licensee to Stemmons, comply with such Licensee's rights relating to such code, for example, by providing Licensee with a copy of the source code for such third-party software code or making that source code available on a Web site without charge, for as long as required by Stemmons' license for the third-party software code.

## 8. Disclaimer of Other Warranties

a) **STEMMONS DOES NOT WARRANT** that the Stemmons Technology will be error free, will meet Licensee's needs, or will operate without interruption.

b) **STEMMONS DOES NOT WARRANT** that the Stemmons Technology will perform as documented in cases of hardware malfunction, misuse of the Stemmons Technology, modification of the Stemmons Technology by any party other than Stemmons (the foregoing is not to be construed as granting Licensee the right to make or have made any such modification), use of the Stemmons Technology in an environment or with other software not described in the documentation or supported by Stemmons, or bugs in other software with which the Stemmons Technology interacts.

c) Except to the extent (if any) explicitly stated otherwise in this Agreement or explicitly agreed otherwise in writing by Stemmons, THE STEMMONS TECHNOLOGY IS **NOT DESIGNED**

Certified Document Number: 101785480 - Page 13 of 26

**EXHIBIT A**

DocuSign Envelope ID: ABBA6B44-BC5E-417A-A848-7875CAB3362E

**OR INTENDED FOR USE IN HAZARDOUS ENVIRONMENTS REQUIRING FAIL-SAFE PERFORMANCE**, including but not limited to any application in which the failure of the Stemmons Technology could lead directly to death, personal injury, or severe physical or property damage.

d) On behalf of Stemmons and its suppliers, to the maximum extent permitted by law, **STEMMONS DISCLAIMS ANY AND ALL <u>OTHER</u> WARRANTIES, DUTIES, CONDITIONS, AND REPRESENTATIONS** (express or implied, oral or written), with respect to the Stemmons Technology or any part thereof, including without limitation any **implied** warranties, duties, conditions, or representations of title, non-infringement, quiet enjoyment, merchantability, fitness or suitability for any purpose (whether or not Stemmons or any of its suppliers know, have reason to know, have been advised, or are otherwise in fact aware of any such purpose), absence of viruses, results, workmanlike effort, or implied term of quality, whether alleged to arise by law, by reason of custom or usage in the trade, or by course of dealing.

e) **STEMMONS DISCLAIMS,** for itself and its suppliers, any warranty, duty, condition, or representation to any person other than Licensee with respect to the Stemmons Technology.

## 9. Limitation of Remedies

a) Each remedy limitation in this Limitation of Remedies section is to be enforced to the maximum extent permitted by law, independently of any other applicable remedy limitation, even if any particular remedy is held to have failed of its essential purpose, and also independently of the warranty-disclaimer provisions of this Agreement. Licensee acknowledges that otherwise Stemmons would not have granted the license on the economic terms associated with such grant.

b) To the greatest extent permitted by law, except as set out below, **NEITHER STEMMONS** nor its subsidiaries, parent company, or affiliates, nor the employees, officers, directors, shareholders, or members of any of them, if any, **WILL BE LIABLE TO LICENSEE** or any person claiming through Licensee, in contract, tort, strict liability, or otherwise, **FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY, OR SIMILAR DAMAGES**, arising from or relating to any alleged or actual breach of this Agreement or from the use of, the results of the use of, or the inability to use the Stemmons

Certified Document Number: 101785480 - Page 14 of 26

Technology, including, as examples but not limitations, lost profits or other economic loss, loss of privacy, loss of confidential information, arising from the use of, the results of the use of, or the inability to use the Stemmons Technology.

c) Other than in respect of Stemmons' obligation, where applicable, to defend and indemnify Licensee against third-party infringement claims (which is addressed above), to the greatest extent not prohibited by law, **THE MAXIMUM AGGREGATE LIABILITY** of Stemmons and its suppliers, subsidiaries, parent company, or affiliates, if any, and their employees, officers, directors, shareholders, and members, to Licensee, or to any person claiming rights through Licensee, in respect of any and all claims arising from or related to this Agreement, in contract, tort, or otherwise, will be the aggregate amount of the applicable Annual License Fees paid by Licensee for the then-current License Term in respect of the Stemmons Technology.

d) Some jurisdictions do not permit limitation or exclusion of remedies under some circumstances, so some or all of the foregoing limitations may not apply to Licensee.

## 10. Payment; Taxes

Unless otherwise agreed in writing:

a) All payments are due in U.S. dollars 30 days from the date of Stemmons' invoice (or Reseller's invoice, if applicable) to Licensee.

b) Licensee will bring any payment dispute to Stemmons' attention no later than the due date of the payment in question.

c) Licensee is responsible for all sales taxes and similar taxes imposed by law in connection with Licensee's acquisition of any license to use the Stemmons Technology and Stemmons' performance of services, if applicable, other than taxes imposed on Stemmons' net income. Unless otherwise agreed in writing, Stemmons may at its option invoice Licensee for such taxes and report and remit them to the appropriate taxing authorities.

d) If Licensee fails to pay an amount due to Stemmons and does not cure the failure within 15 days after notice by Stemmons, then Stemmons, in addition or in the alternative to exercising any other right or remedy available under this Agreement or by law, may, make immediately due and payable any amounts owed by Licensee and / or (as applicable), and

Certified Document Number: 101785480 - Page 15 of 26

DocuSign Envelope ID: ABBA6B44-BC5E-417A-A848-7875CAB3362E

may, in its sole discretion, terminate the license (and with it Licensee's right to use the item of Stemmons Technology), training services, etc., relating to the unpaid amount, by giving notice to Licensee.

## 11. Governing Law; Forum

a) All disputes arising out of or relating to this Agreement or the interpretation, validity, or enforceability thereof will be governed by the laws of the United States of America and the State of Texas as though this Agreement had been made and performed in that state by its residents, without regard to conflicts of law rules.

b) The parties exclude the application of (i) the United Nations Convention on Contracts for the International Sale of Goods; (ii) the Uniform Computer Information Transactions Act ("UCITA"); and (iii) the American Law Institute's Principles of the Law of Software Contracts.

c) The state and federal courts having subject-matter jurisdiction in Houston, Harris County, Texas will have exclusive jurisdiction of any action or proceeding arising out of or relating to this Agreement or any transaction or relationship resulting from it. Each party consents to personal jurisdiction in such court(s), agrees not to contest the same, and agrees not to assert any claim of inconvenient venue.

d) Each party consents to service of process by certified mail, return receipt requested, or by established overnight courier with proof of delivery or refusal (e.g., FedEx or UPS).

## 12. Export Controls

a) Licensee agrees that it will not transfer any aspect of the Stemmons Technology, nor any other software or documentation provided by Stemmons, except in compliance with U.S. export-control regulations or other applicable export laws. (NOTE: transfer or disclosure to a non-U.S. citizen may constitute an 'export' even if occurring within the U.S.)

b) For example, Licensee will not export or re-export any of the foregoing:

   1) to any person on a government-promulgated export restriction list; or

   2) to any U.S.-embargoed countries

c) Licensee represents and warrants that:

Certified Document Number: 101785480 - Page 16 of 26

1) Licensee is not listed in any export restriction list;

2) Licensee is not a citizen or resident of any U.S.-embargoed country;

3) Licensee has not had its export privileges suspended, revoked, or denied by a governmental authority having jurisdiction.

d) If Stemmons so requests, Licensee will sign written assurances and other export-related documents as may be required to comply with applicable export laws.

## 13. U.S. Government

The Software and its accompanying documentation are "commercial computer software" and "commercial computer software documentation," respectively, pursuant to DFAR Section 227.7202 and FAR Section 12.212, as applicable. Any use, modification, reproduction, release, performance, display or disclosure of the Software and accompanying documentation by the United States Government are to be governed solely by the terms of this Agreement and is prohibited except to the extent expressly permitted by the terms of this Agreement. The Manufacturer / Contractor is Stemmons Enterprise LLC, 720 North Post Oak Rd Suite 500, Houston, Texas 77024.

## 14. Savings Clause

If any provision of this Agreement is held to be invalid, void, unenforceable, or otherwise defective by a court or other tribunal of competent jurisdiction, then (i) all other provisions will remain enforceable, and (ii) such provision will be deemed modified to the minimum extent necessary to cure the defect.

## 15. Exclusive Agreement; Amendments

a) This Agreement is the parties' final, complete, exclusive, and binding statement of the terms and conditions of their agreement concerning its subject matter. Each party represents and warrants that, in entering into this Agreement, that party is not relying on any promises, warranties, or representations by the other party that are not stated in (or expressly incorporated by reference into) this Agreement.

b) This Agreement may be amended only by a writing that so states and is signed by the parties; each party agrees not to assert otherwise in any forum.

Certified Document Number: 101785480 - Page 17 of 26

c) If Licensee provides Stemmons (or previously provided Stemmons) or Reseller (if applicable) with a purchase order or similar document, any terms, conditions, or provisions appearing therein (other than as to identification of the Software and of the number and types of licenses, and optionally of any maintenance or any training or consulting services being purchased) will be given effect if and only if the purchase order meets the amendment requirements of this "Exclusive Agreement; Amendments" section.

d) **NO VENDOR**, distributor, reseller, dealer, retailer, or other person (other than an authorized officer of Stemmons) **is authorized to modify this Agreement nor to make any warranty, representation or promise** that is different than, or in addition to, the representations and promises of this Agreement.

e) Stemmons reserves the right to modify the Stemmons Technology; to offer new service plans and discontinue existing ones; and to modify its pricing. Stemmons will not discontinue Licensee's access to a service plan during Licensee's then-current License Term, however, unless, at Stemmons' sole discretion, Stemmons upgrades License to a higher-level service plan for the remainder of the License Term at no extra charge.

## 16. Assignment

a) Licensee may assign this Agreement only (i) with Stemmons' prior written consent, or (ii) without Stemmons' prior consent and upon notice to a wholly owned subsidiary, or in connection with any merger, acquisition, or reorganization involving Stemmons, subject to the following conditions: (A) Licensee, or Licensee's successor, continuing in the same type of business that Licensee was conducting at the time of this Agreement's execution, and (B) Licensee or Licensee's successor providing to Stemmons a written ratification and assumption of this Agreement (in a form reasonably satisfactory to Stemmons) concurrent with the assignment. Any other attempted or actual assignment by Licensee will be void.

b) IF: Licensee assigns this Agreement in violation of the terms herein; THEN: Unless Stemmons expressly agrees otherwise in writing, Licensee's right to use the Software will automatically terminate without the need for notice from Stemmons.

c) Any assignee of this Agreement is to be deemed to have assumed the assigning party's obligations under, and to have undertaken to be bound by the terms and conditions of, this Agreement. The assignment will not relieve the assigning party of liability for any pre-assignment breach of this Agreement.

**EXHIBIT A**

DocuSign Envelope ID: ABBA6B44-BC5E-417A-A848-7875CAB3362E

d) Licensee and its assignee must provide written notification to Stemmons within 30 days of any assignment by Licensee, including the name, address, telephone and contact information of the assignee.

## 17. Force Majeure

a) Neither party will be liable for any failure to perform its obligations where such failure is as a result of Acts of Nature (including fire, flood, earthquake, storm, hurricane or other natural disaster), war, invasion, act of foreign enemies, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption or failure of electricity or telecommunications service (for example, Internet failures).

b) Failure to pay amounts due under this Agreement may be excused under this "Force Majeure" provision, but only if, the failure resulted from failure of or interruption in one or more third-party payment systems caused by an occurrence listed in subparagraph (a) above.

## 18. Early Neutral Evaluation (Non-Binding)

In any dispute, at either party's request the parties will jointly consult an experienced, knowledgeable, neutral individual, informally and in confidence, for non-binding advice as to what would constitute a responsible resolution of the dispute. Any procedural disagreement concerning the consultation will be resolved by reference to the Early Neutral Evaluation Procedures of the American Arbitration Association (AAA) then in effect, to the extent not inconsistent with this Agreement.

## 19. Language

By express agreement of the parties, this Agreement is written in and shall be interpreted for all purposes in accordance with the English language as used in the United States of America. (French translation of the previous sentence: *Les parties conviennent expresssément que le présent Accord ainsi que toutes ses annexes seront rédigés en langue Anglaise et interprétés par référence à la terminologie utilisée aux Etats-Unis.*)

**EXHIBIT A**

Certified Document Number: 101785480 - Page 19 of 26

DocuSign Envelope ID: ABBA6B44-BC5E-417A-A848-7875CAB3362E

## 20. Notices

Except to the extent expressly provided otherwise in this Agreement, all notices required or permitted by this Agreement: (i) must be in writing; (ii) must be addressed to or marked for the attention of a specific individual or position; and (iii) are effective when received or refused by addressee. Notice by email is effective if receipt is acknowledged by the intended recipient.

## 21. Privacy

Licensee agrees that (a) Stemmons may collect, store, use, compile, modify, translate, and/or disclose information Licensee provides to Stemmons as stated in the Stemmons privacy policy or as required by law; and (b) any Reseller may do the same as stated in Reseller's privacy policy, or if Reseller does not have a privacy policy, in Stemmons' privacy policy.

## 22. Email, FAX and Other Communication

Licensee hereby authorizes Stemmons and, if applicable, Reseller, to communicate with Licensee by email and FAX as well as postal and delivery services.

## 23. Waivers

Except as expressly provided otherwise herein, waivers concerning this Agreement must be in express, signed writings. Each party agrees not to assert a waiver that does not comply with the previous sentence.

## 24. Marketing/Promotion

Licensee agrees to participate (at no cost to Licensee) in Stemmons Enterprise's marketing efforts. Furthermore, throughout the term of the License Agreement, Licensee agrees that Stemmons Enterprise may use Licensee's name and logo in marketing materials, including but not limited to its website, publicizing that Licensee operates its business using Licensor's products.

(Version 106.3377)

Certified Document Number: 101785480 - Page 20 of 26

**EXHIBIT A**

# SCHEDULE A
## Fee Schedule & Term

### Stemmons Enterprise Software License

1) Initial License Term:                                            **Ten Years**
   Start Date:                                                      **Agreement Execution Date**
   Anniversary Date:                                               **Execution Date Anniversary**

2) Designated Users ("**DUs**"):                        10 (actual DUs in use, with a minimum of 10)
   Designated Users shall include all employees (full time and part time) and independent contractors, who work for or provide services to Licensee, and Licensee provides access to the Software via Licensee's computer systems. Licensee agrees to use the Licensed Programs throughout its business, and all divisions, subsidiaries, and affiliates, to achieve the widest possible use.

   | | | |
   |---|---|---|
   | Full Access DUs | 10 | |
   | Read Only DUs | n/a | |
   | Concession DUs | n/a | |

3) Technology Included:
   Stemmons Enterprise

4) Annual License Fee:

   | | | |
   |---|---|---|
   | Full Access DUs | $300.00 / DU** | $3,000.00 |
   | Read Only DUs | n/a | $0.00 |
   | Concession DUs | n/a | $0.00 |

   **Total Annual License Fee*:**                                              **$3,000.00**
   *Includes license Fees, updates/upgrades, and support as described in the Agreement.
   **Once Licensee has paid the cumulative amount of $500,000.00 in Total Annual License Fees, the cost of an Annual License Fee for Full Access DUs shall be adjusted to fifty percent (50%) of the then current Annual License Fee for Full Access DUs being charged by Licensor to new Licensees.

5) Renewal Term:                                                   One Year
   License automatically renews upon the Anniversary Date, at the Annual License Fee, for the stated Renewal Term, unless cancelled by ether party. Cancellation subject to Schedule C, the Cancellation Policy. Upon expiration of the Initial License Term and the initial Renewal Term, the Annual License Fee is subject to increase by Licensor on each Anniversary Date. Licensor shall give notice of any increase prior to the Anniversary Date.

### Year 1 - Implementation, Training, Support and Other Services

6) Implementation Services:                                        $n/a
   See Schedule B

7) Training Services:                                              $0.00
   See Schedule D

8) Professional Services Group (PSG) Retainer Fee:                $0.00
   Licensee agrees to pay a retainer of $0.00 (25% of the estimated fees identified in Schedule E) upon execution of this Agreement to be applied to Licensee's final payment under this Agreement. Stemmons Enterprise shall otherwise invoice Licensee for services per this Agreement, and any reasonable expenses incurred in providing the services, monthly in arrears and Licensee shall pay such invoices within thirty (30) days of the invoice date.

9) Data Conversion                      not included               n/a

10) Programming Services                 not included               n/a

   **Total Implementation, Training, Support and Other Services:**            **$0.00**

11) Sub-Total                                                      $3,000.00
12) Sales Tax                                                      $247.50
**13) Total Fee**                                                  **$3,247.50**

14) **License Reconciliation**: Designated Users (Licenses) added during the License Term will be charged a pro-rated annual fee based on Schedule A. Licensee acknowledges that additional DUs and Licensed Programs (i.e., in addition to those initially set forth in this Schedule A) may require additional Fees at Stemmons Enterprise's then-current prevailing rate for the additional DUs or Licensed Programs at the time of Licensee's request. Licensee shall not exceed that stated number of DUs in this Schedule without first requesting additional DUs from Licensor. Licensor shall provide an amended Schedule A and invoice for additional DUs, prorated as applicable. Furthermore,

_____
Client Authorization

**EXHIBIT A**

Licensor shall have the right to audit Licensee's use of the Licensed Program, and to invoice Licensor for additional DUs, if Licensor determines that additional individuals are functioning as Designated Users without coverage under Schedule A.

15) Application hosting, database administration, and network administration associated with the Licensed Programs are Licensee's responsibility.

16) PAYMENT TERMS:                              100% due and payable upon execution of this Agreement.

_____
Client Authorization

**Confidential**

**EXHIBIT A**

## SCHEDULE B
### Implementation

**Implementation Services:**

Environment Setup:

Hosted – On-Premise:
- Description: Licensee will maintain the hosting environment on-premise and provide appropriate user access to allow for the installation of the Technology.

- Tasks:
  - Environmental Validation

- Fee: $0.00*
  *Licensee shall retain, at its sole cost and expense, a third party implementer to implement and configure the Software and Environment.

**OR**

Hosted – In Cloud
- Description: Stemmons will assist with the setup of a cloud environment that hosts the Technology (ex: Azure).
- 
- Tasks:
  - Environmental Validation

- Environmental Setup Fee: $n/a
- Monthly Recurring Fee: **TBD**
  Environment To Be Billed Direct

Technology Setup:
The Technology listed in Schedule A will be installed in the Environment.
- Tasks:
  - Technology Installation & Setup
  - Quality Assurance
  - Client Branding:
    - Small Logo
    - Basic Header
    - Basic Footer

- Fees:
  $0.00
Out of Scope:
- Additional Branding
- Advanced Configuration (to be performed by third party implementer at Licensee's cost)
- Data Integration
- Technology Customization

Assumptions:
- If Hosted On-Premise, the required hardware and software (list will be provided separately) is installed on the systems
- There will be sufficient assistance from the Licensee to support the installation.
- Installation will not exceed services listed in Schedule B

_____
Client Authorization

**Confidential**

**EXHIBIT A**

## SCHEDULE C
### Cancellation Policy, Change of Control or Acquisition

**Cancellation Policy**

This License Agreement is non-cancellable by Licensee for the initial Term.  After the initial Term, this License Agreement shall renew annually automatically until such time as the fees paid to Licensor reach $500,000.00 in licensing fees under this Agreement or from licensing fees paid to Licensor in connection with Referral Customers pursuant to the separate Referral Program Agreement between Licensee and Licensor.  Each annual renewal is non-cancellable.  Licensee may cancel the renewal process with sixty (60) day written notice.   Upon cancelation, Licensee's access to the application will be suspended and the environment will be shut down on the Anniversary Date.  Licensee is responsible for obtaining appropriate data backup's prior to shut down.

**Change of Control or Acquisition**

Any Change of Control or Acquisition event that occurs for Stemmons will not affect the terms of this agreement including the Annual License Fee or the Renewal Term.  In the event Stemmons sunsets the Technology, Licensee will receive a current copy of the source code and support services will be suspended.

_____
Client Authorization

**Confidential**

**EXHIBIT A**

## SCHEDULE D
### Training

Unlimited Administrative and End User training and support will be provided to Licensee via on-demand content including; videos, downloadable system documentation, and a user forum.

Stemmons will provide reasonable efforts, at Stemmons' discretion, to support training and implementation efforts of client and integrator partner.

Notwithstanding the foregoing, Stemmons will provide training to a power user within Licensee's company, designated by Licensee, so that designated employee can assist in the configuration of the Software. The training will occur at Stemmon's office for a period not to exceed two (2) weeks.

Client Authorization

SCHEDULE TO STEMMONS ENTERPRISE SOFTWARE LICENSE v106.3377          **Confidential**

**EXHIBIT A**

## SCHEDULE E
### Professional Services

The Professional Service Group (PSG) Professional Services include business process consultation, data conversion, and programming services as they pertain to the integration of Stemmons Technology beyond what is included in Schedule B (Implementation) of this Agreement.

**No Professional Services are defined or included in this agreement at this time.**

### Professional Services Group

1)  Consulting Services:                                     $0.00
        None Defined or Included

2)  Data Conversion Services:                                $0.00
        None Defines or Included

3)  Programming Services:                                    $0.00
        None Defines or Included

**Total Implementation, Training, Support, and Professional Services:**      **$0.00**

_____
Client Authorization

**Confidential**

**EXHIBIT A**



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 6, 2022

Certified Document Number:        101785480 Total Pages:  26

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# EXHIBIT B



# Stemmons Enterprise Referral Program Agreement

This Stemmons Enterprise Referral Agreement (the "Agreement") is a legal agreement between Boxer Enterprise, LLC d/b/a Stemmons Enterprise, a Texas limited liability company (the "Company"), and you as a participant (the "Affiliate") in the Stemmons Referral Program (the "Program") to refer potential licensee customers for software published by Stemmons Enterprise (the "Product, defined herein"). In order to be an Affiliate, you must comply with all terms and conditions contained in this Agreement. Please read this Agreement carefully before registering and participating in the Program. Please note that throughout this Agreement, "we," "us" and "our" shall mean the Company and "you," "your" and "yours" shall mean the Affiliate.

1. DEFINITIONS.
    a. **Product.** The Product is any executable software application created, maintained, and published by the Company (including but not limited to Stemmons Central and its included applications, and any special-purpose applications licensed separately).

    b. **Proposed Referral Prospect.** A Proposed Referral Prospect is a prospective customer (which we may limit to a specific subsidiary, group, department, division, line of business, etc. within a company or corporate identity) that has been submitted (by you) for consideration (by us) to be included in the Program.

    c. **Qualified Referral Prospect.** A Qualified Referral Prospect is a Proposed Referral Prospect that has been accepted by us, in writing (subject to any limitations or definitions included therein), and therefore is included in the Program.

    d. **Referral Customer.** A Referral Customer is a Qualified Referral Prospect that executes a License Agreement with us during the Referral Eligibility Period and in accordance with the terms and conditions of this Agreement and would therefore generate a Referral Fee.

    e. **Qualified Initial Meeting.** A Qualified Initial Meeting is a single meeting, so designated in writing by us, between us and a Qualified Referral Prospect. While there may be many meetings between us and a Qualified Referral Prospect, the Qualified Initial Meeting signifies a formal beginning of the sales process. Accordingly, there can be only one Qualified Initial Meeting between a given Qualified Referral Prospect and us, and it must be so designated in writing by us, as described herein.

    f. **License Date.** The License Date is the date at which the initial License Agreement between us and a Referral Customer is effective.

    g. **License Revenue.** License Revenue is revenue associated with the license of the Product, and does not include revenue associated with implementation, customization, business process content, consulting, or other ancillary services, and is net of any direct or indirect discounts, credits, or rebates associated with the Referral Customer.

    h. **Referral Fee.** The Referral Fee is equal to the Referral Rate multiplied by the License Revenue from Referral Customers during the Referral Fee Period.

**EXHIBIT B**

DocuSign Envelope ID: A5F26EBD-5662-45BD-8A2F-0330DEC69DC8



i. **Referral Rate.** The Referral Rate is ten percent (10%).

j. **Referral Fee Period.** The Referral Fee Period, which is the amount of time after the License Date during which a Referral Fee is generated, is twenty-five (25) years unless ended or terminated earlier as set forth herein.

k. **Referral Eligibility Period.** The Referral Eligibility Period begins on the date of the Qualified Initial Meeting and ends on the twelve (12) month anniversary of that date.

l. **Non-Qualifying Sale.** A sale is a Non-Qualifying Sale if (a) the sale of the Product is subsequently canceled, (b) the License Revenue or applicable purchase price for the Product is not paid in full, (c) the Product is returned, (d) the sale was a fraudulent transaction, or (e) the sale was to or for subsidiary, group, department, division, line of business, etc. not included in or excluded from the description of the notice designating a Qualified Referral Prospect.

2. REGISTRATION PROCESS.
   a. This graphic is included for illustrative purposes only to demonstrate the anticipated progression from Proposed Referral Prospect to Referral Customer.



b. Affiliate will propose any Proposed Referral Prospects in writing to Company, including sufficient information to materially identify the Proposed Referral Prospect, individual contact information, the nature of Affiliate's relationship, and the specific use of the language "Proposed Referral Prospect."

c. Company may respond, in writing, indicating whether a Proposed Referral Prospect has been accepted as a Qualified Referral Prospect. Such writing will include the specific term "Qualified Referral Prospect" and also any limitations (such as to a specific subsidiary, group, department, division, line of business, etc. within a company or corporate identity) as to the scope of the qualification.

d. Upon or after meeting with a Qualified Referral Prospect, the Company may notify Affiliate that a Qualified Initial Meeting has occurred. To be effective, any such writing must include material information including date of meeting, attendees, location and/or format, and specifically indicate that the meeting constituted the Qualified Initial Meeting using that specific term. In the event that multiple meetings are designated as Qualified Initial Meetings, the earliest so designated shall be considered the controlling date.

Certified Document Number: 101785481 - Page 2 of 7

DocuSign Envelope ID: A5F26EBD-5662-45BD-8A2F-0330DEC69DC8



3. REFERRAL FEE.
   a. We shall pay you the Referral Fee during the Referral Fee Period for License Revenue associated with a Referral Customer.

   b. We reserve the right to change the Agreement and/or Referral Fee at any time. If we change the Agreement or Referral Fee, however, any sales completed prior to the change or sales to Referral Prospects or Referral Customers with a Qualified Initial Meeting Date prior to the change will be paid according to the rates, terms and conditions specified in this document, or by the rates, terms and conditions in effect immediately prior to the change (the Referral Fee during the Referral Fee Period, if and as applicable), so long as there has been no other breach of this Agreement.

   c. All Referral Fees are subject to the following provisions:
      i. The license sale must be finalized (with all signatures final on the license agreement) within the Referral Eligibility Period.
      ii. If the Product is bundled with other software, the Company has the right to change the License Revenue to reflect the lower of the new amount or the last year that the Product was sold separately.
      iii. In the event of a change of control at Stemmons, the Company reserves the right (but not the obligation) to buy out the Agreement and any obligations due thereunder at the lower of ten (10) times the prior year's commission or the number of years remaining on the Agreement times the prior year's commission.

4. QUARTERLY PAYMENTS. The Referral Fee, if due, will be paid quarterly approximately forty-five (45) days after the end of each calendar quarter, for any Referral Fee earned during the previous calendar quarter. If the Referral Fee is less than $100.00, we will hold the Referral Fee until the total Referral Fee due is at least $100.00 or until this Agreement is terminated. If any Referral Fee is paid on a Non-Qualifying Sale, the amount of the Referral Fee paid on such Non-Qualifying Sale may be deducted from subsequent payments of the Referral Fee. If there are insufficient License Revenue to generate Referral Fee payments to recoup the Referral Fee paid on the Non-Qualifying Sale, we will bill you for the amount of the Referral Fee paid on Non-Qualifying Sales and you are responsible for paying us such amount within twenty days of the delivery of the bill.

5. MODIFICATION. We may modify any of the terms and conditions in this Agreement, at any time in our sole discretion. However, any sales with a License Date completed prior to the change or sales resulting from leads generated prior to the change to a Referral Customer will be paid according to the rates, terms and conditions specified in this document (or by the rates, terms and conditions in effect immediately prior to the change), so long as you have provided a written list of the leads within thirty (30) days of notice of the change in terms, and the leads comply with the terms herein. In the event of a change to this Agreement, you will be notified by email and a change notice will be posted on our web site. Modifications may include, but are not limited to, changes in the scope of the Referral Fee, payment procedures and the Program. IF ANY MODIFICATION IS UNACCEPTABLE TO YOU, YOUR ONLY OPTION IS TO TERMINATE THIS AGREEMENT. YOUR CONTINUED PARTICIPATION IN THE PROGRAM FOLLOWING A CHANGE TO THE AGREEMENT AND ITS SUBSEQUENT POSTING ON OUR WEBSITE WILL INDICATE YOUR AGREEMENT TO THE CHANGES.

Certified Document Number: 101785481 - Page 3 of 7

DocuSign Envelope ID: A5F26EBD-5662-45BD-8A2F-0330DEC69DC8



6. REVIEW/TRADEMARKS/MARKETING. Although we have no obligation to review your website and/or sales and marketing materials, we may review your website and/or sales and marketing material for suitability of content. No obscene language, sexually-oriented material, harmful, offensive or discriminatory material may be used on your website and/or sales and marketing material. We reserve the right to terminate your participation in the Program if we determine that your website and/or sales and marketing material is unsuitable. Each party hereby grants to the other party a limited, non-transferable, non-sublicensable, royalty-free, and non-exclusive license during the Term to reproduce, use and display its names, trademarks, trade names, logos and/or services marks ("Marks") within the United States for purposes of branding, marketing and distribution of identifying products and associated services of the other party as set forth in this Agreement and for no other purpose. You shall not make use of any of the Marks of the Company without first submitting a sample of such use to us for our review and prior written approval, which may be withheld or denied for any reason, and any permitted use shall be in accordance with the trademark usage and quality control guidelines of the Company. Notwithstanding anything to the contrary herein, you agree that we shall be given access to, and have the right to use, adopt, copy, sell and license and non-proprietary aspects of your configuration or use of the Stemmons Technology, including but not limited to items such as case types, task types, entity types, standards, quest forms, and similar configurations created or utilized by you or on behalf of a Referral Customer.

7.

8. REPRESENTATIONS AND DISCLAIMERS.
   a. You represent and agree that your conduct conforms and will conform to all applicable laws and regulations and that you do not and will not violate the rights of any third parties, including but not limited to, all intellectual property rights.

   b. You shall notify us immediately of any known or suspected unauthorized use of our Products or website. Any fraudulent, abusive, or otherwise illegal activity shall be grounds for immediate termination of this Agreement by us and referral of the matter to the appropriate law enforcement agency.

   c. You must comply with all US and foreign bribery and corruption laws, and compliance with any applicable local laws in the country of sale.

9. SUBMISSIONS. If you or anyone else sends us creative suggestions, ideas, notes, drawings, concepts or other information ("Information"), the Information will be deemed to be and remain our property. None of the Information shall be subject to any obligation of confidentiality on our part and we shall not be liable or owe any compensation for any use or disclosure of the Information.

10. CONFIDENTIALITY. You acknowledge that in the course of using the Program, access to, or knowledge of or about the Product or related services that you may obtain information or material that is confidential to or trademarked or copyrighted by Stemmons. You agree that software, information or material that is trademarked or copyrighted by Stemmons is the sole property of Stemmons and governed by applicable trademark or copyright law. Confidential information will

Certified Document Number: 101785481 - Page 4 of 7

DocuSign Envelope ID: A5F26EBD-5662-45BD-8A2F-0330DEC69DC8



generally be clearly marked confidential, copyrighted or trademarked and in the event you receive such information you agree not to use or disclose such information.

11. INDEMNIFICATION. Both the Company and the Affiliate  agree to indemnify and hold harmless each other  and their employees, representatives, agents and corporate affiliates, against any and all claims, suits, actions, or other proceedings brought against them based on or arising from any claim (a) that use of any material provided by either of them infringes on any copyright, patent, trademark, trade secret or any other intellectual property right of any third party,  (b) resulting from breach of this Agreement by either of the party, or (c) the negligence or willful misconduct of a party arising from activities related to this Agreement.  The indemnifying party the "Indemnitor") will pay any and all costs, damages, and expenses, including, but not limited to, reasonable attorneys' fees and costs awarded against or otherwise incurred by the other party (the "Indemnitee") in connection with or arising from any such claim, suit, action, or proceeding.  The Indemnitee shall give the Indemnitor: (a) prompt written notice of any such claim or threatened claim; (b) sole control of the defense, negotiations and settlement of such claim; and (c) full cooperation in any defense or settlement of the claim (at the Indemnitor's cost).

12. LIMITATION OF LIABILITY. EXCEPT FOR A BREACH BY A PARTY OF ITS CONFIDENTIALITY OBLIGATIONS OR A PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, NEITHER PARTY WILL BE LIABLE TO THE OTHER WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT UNDER ANY CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUE OR GOODWILL OR ANTICIPATED PROFITS OR LOST BUSINESS), EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

FURTHER, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT FOR VIOLATION BY A PARTY OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, A BREACH BY A PARTY OF ITS CONFIDENTIALITY OBLIGATIONS OR A PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, IN NO EVENT WILL THE COMPANY'S CUMULATIVE LIABILITY TO THE AFFILIATE ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, TORT OR OTHER LEGAL OR EQUITABLE THEORY, EXCEED THE AGGREGATE DOLLAR AMOUNT FOR REFERRAL FEES ACTUALLY PAID TO YOU   UNDER THIS AGREEMENT.

13. ASSIGNMENT. We may assign this Agreement at any time. You shall not have the right to assign this Agreement without our prior written consent.

14. TERMINATION. If Affiliate has not generated a Referral Customer pursuant to the Agreement during any period of eighteen (18) consecutive months, or there is a change in control of the Company to new ownership, this Agreement may be terminated  by the Company  by providing fifteen (15) days written or electronic notice to the other party. If Stemmons terminates the agreement, Referral Fees will be paid on any qualifying sales to a Referral Customer with a License Date that precede the termination, according to the rates, terms and conditions specified in this

Certified Document Number: 101785481 - Page 5 of 7

DocuSign Envelope ID: A5F26EBD-5662-45BD-8A2F-0330DEC69DC8



document (or by the rates, terms and conditions in effect immediately prior to the termination, as applicable). Leads generated before the termination that turn into sales after the termination will also be honored with Referral Payments according to the rates, terms and conditions specified in this document (or by the rates, terms and conditions in effect immediately prior to the termination, as applicable), so long as you have provided a written list of the leads within thirty (30) days of notice of the termination, and the leads comply with the terms herein for Qualified Referral Prospects and results in a License Date during the Referral Eligibility Period. By this means any sales effort motivated by the incentives Stemmons specifies in this document will be honored in commensuration with those incentives. If during the term of this Agreement, we discover that any of your actions violates the laws of Texas, any other entity in the United States, or the United States government, we shall terminate this Agreement immediately and any and all outstanding moneys owed to us by you shall become due and payable immediately.

15. ENTIRE AGREEMENT. This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties. This Agreement may be executed and delivered in separate counterparts, and transmitted to the other party by FAX, or in graphical-image form by email or other electronic transmission, shall be deemed for all purposes to have been executed and delivered by that party to the other party, and each of which shall constitute an original, but all of which together shall constitute one and the same instrument.

16. WAIVER OF CONTRACTUAL RIGHT. Our failure to enforce any provision of this Agreement shall not be construed as a waiver or limitation of our right to subsequently enforce and compel strict compliance with every provision of this Agreement.

17. APPLICABLE LAW. This Agreement shall be governed by the laws of the State of Texas without regard to conflict of laws. Any legal action relating to this Agreement must be brought in the federal or state courts located in Dallas County, Texas.

18. RELATIONSHIP OF PARTIES. Nothing in this Agreement shall constitute or shall be deemed to constitute a partnership or joint venture between the parties hereto or constitute or be deemed to constitute Affiliate as agent of Company for any purpose whatsoever. Affiliate shall have no authority or power to bind the Company or to contract in the name of, or create a liability against Company, in any way or for any purpose.

19. NOTICE. All notices required to be given under this Agreement shall be sent in writing to the persons and at the addresses indicated in this Agreement (i) by certified mail, return receipt requested; or (ii) by FAX, provided that the party giving notice obtains and preserves a machine-printed confirmation of successful transmission; or (iii) by commercial courier that provides written confirmation of delivery. Such persons and locations may be changed upon written notice thereof.

[signatures on following page]

720 N. Post Oak, Suite 500 | Houston | TX 77024 | USA | Tel. 1 (713) 777-7368
www.stemmons.com    sales@stemmons.com

**EXHIBIT B**

Certified Document Number: 101785481 - Page 6 of 7

DocuSign Envelope ID: A5F26EBD-5662-45BD-8A2F-0330DEC69DC8



**Affiliate: Fisker, Inc.**                    **Stemmons Enterprise**
**1875 Century Park East, Suite 370**          **720 N Post Oak Rd, Suite 500**
**Los Angeles, CA 90067**                      **Houston, Texas 77024**
**Attn.: Henrik Fisker**                       **Attn.: Justin Segal**

_____          _____
Print Name (Authorized Representative)              Print Name

_____          _____
                Title                                     Title

Henrik Fisker                                  _____
‎748701AC448C44C...                           80B63F2B553B4A...
_____          _____
              Signature                               Signature
12/6/2016                                      12/6/2016
_____          _____
                Date                                      Date

720 N. Post Oak, Suite 500 | Houston | TX 77024 | USA | Tel. 1 (713) 777-7368
www.stemmons.com     sales@stemmons.com

**EXHIBIT B**



I, Marilyn Burgess, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this   May 6, 2022

Certified Document Number:        101785481 Total Pages:  7

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**